ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SHARON A. VAUGHN, as | ) | |
| Administratix of the Estate of William | ) | |
| Harrison Vaughn, Jr., Deceased, and | ) | |
| SHARON A. VAUGHN, as Guardian and | ) | |
| Next Friend of Kiarra L. Ashner, a Survivor | ) | |
| of William Harrison Vaughn, Jr., Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 04-4083-JAR |
| COUNTY COMMISSIONERS OF | ) | |
| SHAWNEE COUNTY, KANSAS; | ) | |
| SAMUEL D. TURPIN and BETSY | ) | |
| GILLESPIE, as individuals and as officials | ) | |
| of Shawnee County, Kansas, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

William Harrison Vaughn, Jr. was detained at the Shawnee County Department of Corrections (DOC) at the time of his death. His administratix and survivor now assert violations of his Eighth and Fourteenth Amendment rights under 42 U.S.C. § 1983 and negligence under Kansas law. Plaintiffs seek monetary damages under section 1983 against Corrections Specialist (C.S.) Samuel Turpin; and DOC Director of Corrections Betsy Gillespie, in their individual and official capacities. Plaintiffs also

assert an official capacity claim against the Shawnee County Commissioners under section 1983.[1]   The

Court now considers defendants' Motion for Summary Judgment (Doc. 49), where they argue: (1)

Turpin and Gillespie enjoy qualified immunity from suit under section 1983 in their individual capacities;

(2) summary judgment is appropriate on plaintiffs' deliberate indifference claims; (3) plaintiffs'

negligence claim fails because there is no evidence that the alleged breach of duty was the proximate

cause of Vaughn's death; and (4) defendants are immune from negligence claims under the Kansas Tort

Claims Act (KTCA).

## I.  BACKGROUND

William Harrison Vaughn, Jr. was arrested and brought to the Adult Detention Center at the

DOC on October 3, 2003 at approximately 3:45 a.m.  Vaughn was stopped that morning for a traffic

violation and arrested because he had an outstanding Limited Actions Warrant.  Prior to being

processed, Vaughn exhibited agitated behavior such as pacing and doing pushups in his holding cell.

Later in the morning, C.S. Edna Stamps processed Vaughn's booking paperwork.  Pursuant to DOC

policies and procedures, Stamps was required to notify a supervisor that a  suicide risk screening was

in order if a detainee had been incarcerated in the Adult Detention Center within the past twelve months

and if the detainee's last release from the Center was from Suicide Watch or Close Observation status.

Vaughn's most recent incarceration at the DOC was in May 2002.  Despite the fact that he was

released from Suicide Watch at that time, since it was more than 12 months before the October 2003

arrest, under the DOC policies and procedures, further screening was not required.

---

[1]The Pretrial Order makes clear that the individual capacity claims against the commissioners are dismissed
without prejudice.  (Doc. 46 n.2.)

At the DOC, Suicide Watch status is given to inmates who are "imminently" suicidal. Precautions are taken with these inmates such as the use of anti-suicide blankets and garments, and health and well-being checks every four minutes by staff.  Close Observation status is given to inmates who are not considered imminently suicidal, but who possess one or more suicide risk factors. Precautions taken with these inmates include frequent shakedowns of the cells and fifteen-minute health and well-being checks.

During the initial booking, Stamps asked Vaughn if he had a history of psychiatric problems, and if he had ever attempted suicide.  Vaughn answered "no" to both questions.  Vaughn also refused an initial medical screening when it was initiated by a staff nurse.  At the time of his booking, Vaughn had cash necessary to bond himself out, but chose not to do so.  He indicated to the booking officers that he wanted to see a judge and to save the money for taxicab fare.  After processing, Vaughn was initially assigned to a cell in the K Module.  K Module is a minimum security module that has six cells, each with the capacity to house eight inmates.

On the night of October 3, Vaughn complained to a C.S. that there were too many people in his cell.  He told the C.S. that unless someone was moved out of the cell, Vaughn wanted to be moved to the Special Housing Module (SHM).  The C.S. took Vaughn's request to his sergeant, who then spoke with Vaughn.  The sergeant advised Vaughn of the conditions at the SHM.  SHM is a maximum security module that has two levels of cells.  Each level contains 20 one person cells.  The officers assigned to the SHM must request that the doors to the cells be opened through a control center except for two protrusion-free cells that the officers have keys to open.  The inmates assigned to SHM spend the majority of time confined to their cells and officers conduct headcounts every thirty minutes.

3

Vaughn informed the sergeant that he wished to be moved to the SHM so that he could sleep. The sergeant authorized this transfer, writing a report that indicated Vaughn would be on Administrative Segregation until he could be reclassified by the Classification Department.

Two officers were assigned to the SHM on October 4, 2003: C.S. Turpin and C.S. Rhone. Turpin received training on suicide prevention through the DOC. Turpin understood that he was to notify a supervisor if he observed an inmate displaying suicidal risk factors, pursuant to the policies and procedures at the DOC. These policies set forth twenty-five risk factors and behaviors for which all staff should consistently monitor. These risk factors and behaviors include things like sleeping difficulties, giving away personal possessions, and being highly agitated, afraid, or angry. No officer reported to a supervisor that Vaughn was displaying any risk factors or behaviors for suicide on October 3 or 4, 2003.

Turpin was not informed when he went on duty on October 4, 2003 that Vaughn had previously been incarcerated at the DOC under Suicide Watch status, nor was he informed that Vaughn had requested to be transferred from the K Module to the SHM. Vaughn told Eve Kendall, the Intelligence and Investigation Manager at the DOC, that during most of his shift, Vaughn was lying down on his bed in his cell. At approximately 6:20 p.m., Vaughn asked Turpin through his cell door why he was there. Turpin replied that he would try to find out and check to see if a supervisor would approve a telephone call for him. At approximately 7:04, C.S. Rhone found Vaughn hanging from a bedsheet that was fastened to the air intake grate of his cell. He was pronounced dead at Stormont-Vail Hospital in Topeka, Kansas at approximately 8:00 p.m. Both Rhone and Turpin admit that they missed a number of 30-minute headcounts in the SHM on October 4 and that they falsified the

observation logs to reflect that they conducted 30-minute observations that they did not in fact conduct. Both officers were temporarily suspended for failing to conduct their headcounts as required.  Some time in 2004, Turpin was terminated for leaving the SHM without permission.

Betsy Gillespie has been the Director of Corrections at the DOC since August 2000.  When she began her tenure, she analyzed the suicide prevention policies at the jail and made a number of changes.  She consulted with Dr. Thomas White in January 2001, who made certain recommendations for the jail's suicide prevention policy.  Changes made include changing Suicide Watch checks from every fifteen minutes to every four minutes, identifying and screening risk factors in inmates, creating the Close Observation status, and looking at different methods by which inmates may commit suicide.  In December 2001, one inmate at the DOC committed suicide by hanging after fastening a bed sheet to an air intake grate in his cell.  In November 2002, another inmate committed suicide in the Close Observation unit by hanging from a bed sheet attached to a cell door.  Prior to Vaughn's suicide, Gillespie had decided that the greater priority for suicide prevention was proper screening and supervision of inmates than physical changes to the facility.  After Vaughn's suicide, Gillespie changed the system of air vents in the jail to cover them up and make them less able to aid in suicides.

In late October 2003, Kendall produced an investigative report concerning Vaughn's death.  In conducting this investigation, Kendall interviewed all of the officers involved in Vaughn's case, reviewed his paperwork, and viewed surveillence tapes.  The report stated that Vaughn was found to have illicit drugs in his system by the autopsy, although he did not appear extremely impaired to C.S. Stamp during his initial processing.  Kendall was ultimately unable to determine why Vaughn committed suicide.

5

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[3]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[4]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[5]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[6]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[7]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[8]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that

---

[2]Fed. R. Civ. P. 56(c).

[3]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4]*Id.*

[5]*Id.* at 251–52.

[6]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[7]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[8]*Id.*

would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[10]

## III.  DISCUSSION

### A.  Section 1983 Claims

#### 1.  Individual Capacity Claims

Under section 1983, a suit against a government official may be made to impose individual liability for actions taken under color of state law.[11]  In order to establish individual liability in a section 1983 suit, a plaintiff only need show that the official, "acting under color of state law, caused the deprivation of a federal right."[12]  A defendant sued in her individual capacity may be able to assert personal immunity defenses such as qualified immunity.[13]

Upon a defendant's assertion of a qualified immunity defense in a summary judgment motion, plaintiff has a two-part burden.  Plaintiff must come forward with facts or allegations that the defendant's conduct was a violation of a clearly established constitutional or statutory right at the time of its occurrence and that the violated right was "clearly established such that a reasonable person in the

---

[9]*Id.*

[10]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[11]*Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[12]*Id.* at 165.

[13]*Id.*

defendant's position would have known the conduct violated the right."[14]   The issue of immunity is a

legal one and the Court may not avoid it by framing it as a factual issue.[15]   The Supreme Court counsels

that before addressing the issue of qualified immunity, the Court must first consider: "Taken in the light

most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a

constitutional right?"[16]

Here, plaintiffs allege Eighth and Fourteenth Amendment violations against the individual

defendants.  Although the Eighth Amendment only applies to convicted inmates, the Fourteenth

Amendment due process clause provides for the same degree of medical attention to pretrial detainees

as the Eighth Amendment provides for inmates.  The Tenth Circuit has stated:

> [W]e conclude that in this circuit a prisoner, whether he be an inmate
> in a penal institution after conviction or a pre-trial detainee in a county jail,
> does not have a claim against his custodian for failure to provide
> adequate medical attention unless the custodian knows of the risk
> involved, and is 'deliberately indifferent' thereto. . . . And the same
> standard applies to a claim based on jail suicide, i.e., the custodian must
> be 'deliberately indifferent' to a substantial risk of suicide.[17]

Therefore, in order to allege a violation of Vaughn's constitutional rights by failing to protect  him from

suicide, the plaintiffs must prove that the individual defendants were "deliberately indifferent" to a

substantial risk of suicide.  Deliberate indifference is a higher standard than either simple negligence or

---

[14]*Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997); *see Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).

[15]*Lawmaster*, 125 F.3d at 1347.

[16]*Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005).

[17]*Barrie v. Grand County, Utah*, 119 F.3d 862, 869 (10th Cir. 1997).

heightened negligence.[18]  The subjective component of the deliberate indifference standard requires that the official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[19]  Even if the defendant lacks actual knowledge of a substantial risk of harm, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[20]

> While the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him . . . he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist . . . . It is not enough merely to find that a reasonable person would have known, or that the defendant should have known.[21]

"[I]f a risk is obvious so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it."[22]  The Court will evaluate the threshold question of whether plaintiffs allege a constitutional violation under this standard with regard to defendants Turpin and Gillespie.

### a.  Defendant Turpin

Plaintiffs allege that defendant Turpin was deliberately indifferent because he, (1) did not place Vaughn in Suicide Watch or Close Observation during his incarceration at the DOC; (2) did not appropriately respond to actions by Vaughn that "would indicate suicidal actions or tendencies"; (3) did

---

[18]*Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407–10 (1997).

[19]*Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998); *see Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[20]*Farmer*, 511 U.S. at 842.

[21]*Id.* at 843 n.8.

[22]*Mata v. Saiz*, __F.3d__, No. 03-1247, 2005 WL 2697249, at *4 (10th Cir. Oct. 21, 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

not adequately supervise or monitor Vaughn at the time of his death; (4) did not follow established DOC procedures for monitoring and observing Vaughn; (5) ignored aspects of "Vaughn's profile" that "fit that of a legitimate suicide threat"; (6) failed to screen Vaughn for suicidal thoughts and actions; and (7) falsified observation logs.[23]  Defendants argue that Turpin had no knowledge of a substantial risk of suicide by Vaughn and that there was no obvious substantial risk present.

Under the two-prong deliberate indifference standard, plaintiffs must establish that Turpin was aware of a substantial risk that Vaughn would imminently commit suicide before the Court may address whether he responded to that threat adequately.[24]  Turpin was responsible for supervising detainees in the SHM, which was located in the general population at the DOC.[25]  It is undisputed that he had no responsibility for screening Vaughn in order to determine where to place him for detainment at the DOC. He conducted no medical or psychological screening of Vaughn, and was not privy to any information about his background.  It is undisputed that Turpin had no actual knowledge of a substantial risk that Vaughn would commit suicide.  Instead, plaintiffs argue that the risk was obvious, and that Turpin was aware of facts upon which an inference could be drawn of a substantial risk of suicide.  Therefore, the Court must look at the facts referenced by plaintiffs to determine if such an inference could have been

---

[23]Plaintiffs' alleged bases for the deliberate indifference claim are taken from the Pretrial Order (Doc. 46 at 12–13).  The Court has condensed some of the listed grounds.  The Court does not include grounds that do not apply to the individual capacity claim against this particular defendant.  For example, plaintiffs allege deliberate indifference based on failure to train against defendant Turpin.  There is no evidence in the record that this defendant was responsible in any way for training or making decisions regarding personnel or facilities.  Those are appropriately discussed under the official capacity claim.

[24]See, e.g., Craig, 164 F.3d at 495.

[25]The Court uses the term "general population" only as distinguished from Suicide Watch and Close Observation units at the DOC.

and was drawn.

Plaintiffs actually allege the inverse of actual knowledge by Turpin.  They argue that because Turpin missed a number of scheduled thirty-minute observations the day of Vaughn's death, "it is certainly no surprise that [he] allegedly saw or observed no unusual behavior on the part of William Vaughn."[26]  They also appear to allege that because Vaughn was located in the SHM, Turpin should have been aware that he posed a suicide risk.  In the Statement of Facts section of the response memorandum, plaintiffs include the opinion of Dr. Lofgreen, who stated that Vaughn was exhibiting signs of suicidal behavior such as being abusive, intoxicated, and irrational.  Dr. Lofgreen opined that this behavior should have caused further screening of Vaughn, which would have led to his placement in Suicide Watch or Close Observation.

The Court finds that there is no genuine issue of material fact concerning Turpin's subjective knowledge of a suicide risk by Vaughn.  The failure to classify Vaughn as a suicide risk upon initial screening may not be attributed to Turpin.  He was assigned to guard Vaughn only after he was placed in the SHM.  Turpin had been trained to identify warning signs for suicide and was directed to monitor all inmates for those warning signs.  It is undisputed that Turpin did not subjectively observe Vaughn exhibit any of the warning signs listed in the DOC policies and procedures.  Furthermore, there is no evidence that Vaughn's request to be placed in the SHM alone should have indicated that he posed a substantial risk of suicide.  The Kendall Investigation Report states that Vaughn was placed on Administrative Segregation only until a Classification Department could reclassify him and only after he

---

[26](Doc. 56 at 57.)

explicitly requested to be moved.  Plaintiffs point to no evidence to suggest that this request constituted a suicidal risk factor, and they point to no evidence that only suicidal detainees were housed in the SHM. The record shows that Vaughn was placed in the SHM upon his request for a single-bed cell because he was having difficulty sleeping in a multi-bed cell.  Even if this did constitute a risk factor for suicide, there is no evidence to suggest that it should have been obvious to Turpin that there was a *substantial* risk that Vaughn would commit suicide.

Finally, the Court finds that Dr. Lofgreen's expert testimony fails to establish obviousness of a substantial risk of suicide to defendant Turpin.  Dr. Lofgreen stated that Vaughn was displaying suicidal warning signs that the officers were trained to detect.  According to Dr. Lofgreen, Vaughn was exhibiting irrational behavior by not paying the bond required to release him from jail.  He also cited Vaughn's intoxication and previous incarceration as flags that should have prompted further screening when Vaughn was booked into the facility.  But, none of this information indicates that defendant Turpin, who did not guard Vaughn until he was transferred from the K module to the SHM, had knowledge of any of this behavior.  By all accounts, Vaughn slept during much of his time in the SHM.  The only interaction between Turpin and Vaughn occurred when Vaughn asked why he was in jail.  Certainly, this fact alone could not lead a reasonable person to believe that there was a substantial risk that Vaughn would commit suicide.

### b.  Defendant Gillespie

In the pretrial order, plaintiffs allege that defendant Gillespie was deliberately indifferent by, (1) failing to provide adequate personnel, facilities, procedures, and supervision despite knowledge that Vaughn exhibited suicidal tendencies; (2) implementing substandard personnel, facilities, procedures,

causing inadequate monitoring of inmates; and (3) insufficiently training personnel.

As Director of Corrections at the DOC, any liability attributed to Gillespie in her individual capacity must be through her capacity as a supervisor.  "To establish a supervisor's liability under § 1983 [plaintiffs] must show that 'an 'affirmative link' exists between the [constitutional] deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise.'"[27]  The Court has already found that Turpin's actions do not rise to the level of a constitutional deprivation.  Therefore, supervisory liability may not attach to Gillespie based on a failure to supervise Turpin.  Furthermore, there is no evidence presented by plaintiffs that Gillespie had any knowledge of a substantial risk of suicide by this plaintiff.  Again, other unnamed officials were responsible for Vaughn's intake screening.  There is no evidence that Gillespie had any subjective knowledge of risk factors that Vaughn may have displayed that indicated he was suicidal.  "Plaintiffs have only presented evidence that the certain individuals that came into contact with [detainee] should have known that []he was suicidal or otherwise facing an excessive risk to her health and safety . . . but it is certainly not the type of culpability that rises to the level of § 1983 liability."[28]

Plaintiffs seem to suggest, however, that an independent basis for liability exists because of Gillespie's "personal participation" in failing to train personnel, and in failing to maintain policies and procedures that appropriately screen for suicidal tendencies in detainees.  Although these claims are better suited to a discussion of an official-capacity claim, the Court will address them at this time.  It is

---

[27]*Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997) (quoting *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988)).

[28]*House v. County of Macomb*, 303 F. Supp. 2d 850, 854–55 (E.D. Mich. 2004).

undisputed that two prior suicides occurred during Gillespie's tenure at the DOC.  There is no evidence that these suicides occurred because of a failure to properly screen; indeed at least one of these individuals posed some level of suicide risk to have been placed in Close Observation.  Furthermore, it is undisputed that Gillespie actually instituted changes in the screening and monitoring policies to better address suicide risks during her tenure after receiving recommendations from Dr. Thomas White on suicide prevention.  These changes included better screening, and a multi-tiered system of placement for inmates.

Plaintiffs suggest that Gillespie opted not to include background information on detainees beyond twelve months prior to booking, deliberately, in order to avoid prison officials obtaining subjective knowledge of suicidal tendencies.  This is a serious allegation which is not supported by any evidence in the summary judgment record.  According to Gillespie, this practice was recommended by Dr. White.  Aside from questioning her credibility on this fact, which of course the Court may not consider on summary judgment, plaintiffs point to no evidence other than Dr. Lofgreen's conclusion that "the jail intentionally did not allow the guard to know that this man was a suicide risk."  Dr. Lofgreen cites no evidence in support of this conclusion.  The Court finds that although Gillespie could have taken more measures to prevent suicide at the jail, there is no evidence that her failure to address the air vents in the SHM amounted to deliberate indifference to a known risk.  Although Gillespie was aware that the air vents could be utilized for suicide, as shown by the December 2001 suicide, she had determined that it was a greater priority to focus on proper screening and supervision of inmates to avoid suicides in the future.

In order to establish liability based on failure to train, it is not enough for plaintiffs to show "**that**

14

there were general deficiencies in the county's training program for jailers.  Rather, [they] must identify a specific deficiency in the county's training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety."[29] There is no evidence in the record tending to show that there was a specific training deficiency that actually caused Vaughn's suicide.  The undisputed evidence shows that all of the prison officials discussed in plaintiffs' briefs received suicide training.  Plaintiffs suggest general deficiencies in this training and point out that prison officials had trouble recalling certain training information during their depositions, however no specific flaw is discussed that plaintiffs suggest caused Vaughn's suicide.  The Court finds that there is no genuine issue of material fact over whether there was a specific deficiency in the training of DOC officials that caused Vaughn's suicide.

As one Court has pointed out: "The question is not, 'Could the Defendants have surmised from this information that [Vaughn] might commit suicide?'"[30]  Instead, the proper question is whether all of the facts taken together made the risk of suicide so obvious to defendants that the trier of fact could infer actual knowledge.[31]  The evidence is insufficient to create such an inference.  Because the Court finds plaintiffs are unable to allege that the individual defendants caused a constitutional deprivation, there is no need to proceed to determine if qualified immunity shields them from suit.

**2. Official Capacity Claim**

An official-capacity suit is another way of pleading an action against the governmental entity

---

[29]*Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999).

[30]*Strickler v. McCord*, 306 F. Supp. 2d 818, 827 (N.D. Ind. 2004).

[31]*Id.*

itself.[32]  Municipalities and other local governments, such as counties, may be sued under section 1983

for constitutional torts.[33]  A local government may be held liable where its action "*itself* violates federal

law, or directs an employee to do so."[34]  But, "[w]here a plaintiff claims that the municipality has not

directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of

culpability and causation must be applied to ensure that the municipality is not held liable solely for the

actions of its employee."[35]  A local government may not be held liable for tortious acts committed by its

employee if the employee committed no constitutional violation.[36]  In order to establish liability, the

government official must have committed a constitutional violation, and the entity itself must have been

the "moving force" behind the alleged deprivation, so the entity's "policy or custom" must have

contributed toward the constitutional violation."[37]

Plaintiffs' claim against the County Commissioners is another way of suing Shawnee County

itself.[38]  As is the case with supervisory liability, "a municipality may not be held liable where there was

---

[32]*Id.*  The Supreme Court has explained that in an official capacity suit, death or replacement of the named
official will automatically trigger substitution of the official's successor.  *Id.* at 166 n.11.

[33]*Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

[34]*Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404–05 (1997).

[35]*Id.* at 406.

[36]This rule is inapplicable, however, if the individual defendants are not liable on the grounds of qualified
immunity.  *Myers*, 151 F.3d. at 1317.  "Municipalities enjoy no such shield."  *Id.* (internal quotation omitted).

[37]*Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Monell v. Dept. of Soc. Servs. of the City of New York*, 436
U.S. 658, 694–95 (1978); *Myers*, 151 F.3d at 1316.

[38]*Myers*, 151 F.3d at 1316 n.2.

no underlying constitutional violation by any of its officers.'[39]   In this case, the Court has found that there was no constitutional violation by either named prison official.   The Court found that these officials either lacked the requisite knowledge of a substantial risk of suicide by Vaughn, or responded to that threat reasonably under the circumstances.[40]

Plaintiffs also appear to argue, though, that the County's policies are unconstitutional because they do not allow for appropriate screening of detainees.   As discussed above, the Court finds that there is no genuine issue of material fact over whether the screening policy is unconstitutional.   Plaintiffs are unable to come forward with evidence suggesting that the County's neutral policies were promulgated with the intent to avoid liability.   It is undisputed that the County consulted with a suicide expert when promulgating their policies and procedures on screening.   The County instituted the multi-tiered placement system, increased supervision of inmates in Suicide Watch, and attempted to improve its screening policies.   There is no indication that the policy which requires booking staff to notify a supervisor if a detainee had been incarcerated in the prior 12 months, as opposed to further back in time, is unconstitutional in light of all of the safeguards put in place specifically to avoid suicides.[41]   Conclusory allegations will not suffice to create a genuine issue of material fact.

Finally, the Court notes that plaintiffs suggest the County should be held liable for its decision to

---

[39]*Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *see Jiron v. City of Lakewood*, 392 F.3d 410, 419 n.8 (10th Cir. 2004) ("when a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation—i.e., the first step of the qualified immunity analysis—a finding of qualified immunity *does* preclude the imposition of municipal liability.").

[40]Plaintiffs reference individuals who are not named defendants in the case, who they claim acted deliberately indifferent on behalf of the County, such as C.S. Rhone.

[41]*See, e.g.*, *Estate of Sisk v. Manzanares*, 262 F. Supp. 2d 1162, 1183 (D. Kan. 2002) (considering the entire context of the DOC's policies, procedures, and practices).

hire Gillespie as Director of Corrections.  The Court will only briefly address this argument, as it was not

developed in the response brief or pretrial order as a distinct basis for liability.  With regard to hiring

decisions by a local government, the Supreme Court has stated:

> Cases involving constitutional injuries allegedly traceable to an
> ill-considered hiring decision pose the greatest risk that a municipality
> will be held liable for an injury that it did not cause. In the broadest
> sense, every injury is traceable to a hiring decision. Where a court fails
> to adhere to rigorous requirements of culpability and causation,
> municipal liability collapses into respondeat superior liability. As we
> recognized in *Monell* and have repeatedly reaffirmed, Congress did not
> intend municipalities to be held liable unless deliberate action attributable
> to the municipality directly caused a deprivation of federal rights. A
> failure to apply stringent culpability and causation requirements raises
> serious federalism concerns, in that it risks constitutionalizing particular
> hiring requirements that States have themselves elected not to impose.[42]

Here, the Court finds no deliberate action by the County in hiring Gillespie that directly caused the

deprivation of Vaughn's constitutional rights.

## B.  State Law Negligence Claims

Defendants further argue that they are entitled to summary judgment on the state law negligence

claims because they are immune from suit under the KTCA and because there is no evidence of

causation.  Because the Court grants summary judgment to defendants on the federal claims, the Court is

authorized to decline supplemental jurisdiction over the remaining state law claims.[43]  Whether to

exercise supplemental jurisdiction is committed to the court's sound discretion.[44]  28 U.S.C. § 1367

---

[42]*Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 415–16 (1997) (citations omitted).

[43]28 U.S.C. § 1367(c)(3).

[44]*City of Chicago  v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997); *see Anglemyer v. Hamilton
County Hosp.,* 58 F.3d 533, 541 (10th Cir. 1995).

"reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity.'"[45]

Upon a pretrial disposition of the federal claims, district courts will generally dismiss the state law claims without prejudice.[46] This general practice is in keeping with the holdings of the Supreme Court and the Tenth Circuit.[47] "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."[48]

Here, the "compelling reasons" point in favor of state rather than federal court resolution of the state law claims. There is a dispute as to whether defendants' are immune from suit under the KTCA. Determining whether these defendants are immune requires an analysis of not only the statutory exceptions to liability under the KTCA, but also whether any of these defendants owed a legal duty to Vaughn.[49] In addition, the claims may require an analysis of whether the tort of negligent supervision may apply, which is an unsettled area of Kansas law. Where a state law cause of action is in a process of current evolution, it is particularly appropriate for the federal courts to leave the continuing

---

[45]*City of Chicago*, 522 U.S. at 173 (quoting *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Gold v. Local 7 United Food & Commercial Workers Union*, 159 F.3d 1307, 1310 (10th Cir. 1998), *overruled on other grounds by Styskal v. Weld County Commr's*, 365 F.3d 855 (10th Cir. 2004).

[46]*Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (collecting cases); *see also Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1237 (10th Cir. 1997).

[47]*Ball*, 54 F.3d at 669.

[48]*Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

[49]*See, e.g., Estate of Sisk v. Manzanares*, 262 F. Supp. 2d 1162, 1184–88 (D. Kan. 2002) (analyzing state law negligence claims against officials at the DOC in a prisoner suicide case).

development and application of that cause of action to the state courts.[50]  Finally, there is a dispute over whether plaintiffs are able to show causation, which is strictly a state law issue.

Further, plaintiffs are free to pursue their claims in a Kansas court because even if the statute of limitations would otherwise have run, 28 U.S.C. § 1367(d) tolls the statute of limitations during the time the claim is pending and affords them at least 30 days from a current federal court dismissal to commence a new action in the state court.[51]  In this case, because discovery is complete, the Court conditions dismissal on use of all discovery in any subsequently filed state court case.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Motion for Summary Judgment (Doc. 49) is **GRANTED** as to all federal claims.

**IT IS FURTHER ORDERED BY THE COURT** that because the Court declines to exercise supplemental jurisdiction in this case, plaintiffs' state law claims are dismissed without prejudice.

**IT IS SO ORDERED**.

Dated this _7th___ day of November 2005.

_ S/ Julie A. Robinson_____

Julie A. Robinson
United States District Judge

---

[50]*Ball*, 54 F.3d at 669.

[51]28 U.S.C. § 1367(d).  *Cf. Jinks v. Richland County, S.C.*, 538 U.S. 456, 466–67 (2003) ("no constitutional doubt arises from holding that [a] claim against . . . a political subdivision of a State—falls under the definition of 'any claim asserted under subsection (a).'").  Kansas's "saving statute," K.S.A. 60-518, affords a plaintiff six months to commence a new action if a previous timely action failed "otherwise than upon the merits."  Examples of such failures include dismissal without prejudice.  *See Rogers v. Williams, Larson, Voss, Strobel & Estes*, 777 P.2d 836, 839 (Kan. 1989).  If applicable, this time frame controls over the 30-day tolling period in 28 U.S.C. § 1367(d).